UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ahmed Sami, | **COMPLAINT** |
| Plaintiff, | Index No. 21-cv-2785 |
| -against- | |
| The City of New York, Officer Jonathan Molina, Officer FNU Ayala, and Officers John Doe # 1 to # 7, Individually and as Members of the New York City Police Department, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ahmed Sami ("Plaintiff" or "Sami"), by his attorneys, the Law Offices of Joel B. Rudin, P.C., alleges as follows:

### PRELIMINARY STATEMENT

1.     After the police killing of George Floyd, many thousands of New Yorkers took to the streets in peaceful protest last year to express their opposition to police brutality.

2.     The New York City Police Department ("NYPD") responded by conducting mass arrests and, in many cases, violently assaulting demonstrators. The NYPD arrested over 2,000 Black Lives Matter protesters between May 28, 2020, and June 5, 2020.

3.     Ahmed Sami was one of them.

4.     While Sami was trying to leave a peaceful protest at about 8:00 p.m. on June 2, 2020, cordially chatting with a group of police officers, another group of police officers arrested him and his friends for purportedly violating the 8:00 p.m. mayoral curfew.

5.    Despite telling Sami at the scene that he would be released with a summons, police officers transported Sami and his friends to a mass arrest processing center in Brooklyn, where he was held in a cell for several hours before finally being released with a summons.

6.    Sami repeatedly told officers that his handcuffs were too tight and causing him pain, complaining during the van ride to Brooklyn and then again at Central Booking.

7.    But police officers refused to take any action to loosen or remove Sami's plastic handcuffs—or "flex-cuffs"—for hours, instead ignoring his complaints or telling him to shut up.

8.    By the time police officers finally removed his flex-cuffs at Brooklyn Central Booking, several hours after he first complained, Sami was in excruciating pain.

9.    As a result of being handcuffed too tightly, Sami suffered nerve damage that resulted in burning pain for months and significantly impaired his work and life.

10.   Even today, nearly a year after his arrest, his hands are sometimes numb.

11.   His injuries were directly and proximately caused by the deliberate indifference of municipal policymakers, who were aware that demonstrators had repeatedly been injured by the NYPD's use of plastic handcuffs when policing protests, but failed to train, instruct, discipline, or supervise NYPD officers to ensure the proper application of flex-cuffs to avoid causing injury.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

12.   This action arises under 42 U.S.C. § 1983 and New York State common law.

13.   Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction over Plaintiff's state-law claims is conferred by 28 U.S.C. § 1367.

14.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in Brooklyn.

15. This action is timely because it was commenced within three years of the time that Sami's federal claims accrued and within one year and 90 days of the time that Sami's state-law claims accrued.

16. Sami served a notice of claim upon the City of New York on August 27, 2020, within the statutory 90-day period to do so.

17. Sami was deposed at a hearing held under section 50-h of the New York City General Municipal Law on December 9, 2020.

18. More than thirty days have elapsed since Plaintiff served a notice of claim and the City of New York has not offered adjustment or payment thereof.

**THE PARTIES**

19. Plaintiff, Ahmed Sami, is a citizen and resident of the State of New York and the United States. He resides within the Southern District of New York.

20. Defendant City of New York ("City") is a municipal corporation of the State of New York. The City operates and maintains the NYPD as a constituent department or agency.

21. Defendant Jonathan Molina ("Molina"), shield number 17327, was at all relevant times a police officer employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

22. Defendant FNU Ayala was at all relevant times a police officer employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

23.     Defendants John Doe # 1 to # 7 were at all relevant times police officers employed by the NYPD, acting within the scope of their authority and under color of State law. They are named here in their individual and official capacities.

## JURY DEMAND

24.     Plaintiff demands a trial by jury.

## STATEMENT OF FACTS

### The George Floyd Protests, the Curfew, and the NYPD's Mass Arrests

25.     On May 25, 2020, police officers in Minneapolis murdered George Floyd. This killing was widely reported, and a video of it went viral on social media.

26.     On May 28, 2020, three days later, widespread Black Lives Matter protests began throughout New York City. They continued during the following week.

27.     Demonstrators expressed outrage at George Floyd's death, a long history of police brutality, and systemic anti-Black racism.

28.     The overwhelming majority of these protests—and protesters—were peaceful.

29.     On June 1, 2020, Governor Andrew Cuomo and Mayor Bill de Blasio announced that New York City would be subject to a 11:00 p.m. to 5:00 a.m. curfew that evening.

30.     Later that same day, Mayor de Blasio issued Emergency Executive Order No. 118, instituting "a City-wide curfew from 8:00 p.m. on June 2, 2020 until 5:00 a.m., on June 3, 2020. During this time, no persons or vehicles may be in public."

31.     Emergency Executive Order No. 118 specified that "[f]ailure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provision in

4

this Order shall be guilty of a class B misdemeanor" under New York City Administrative Code § 3-108.

32.     On June 1, 2020, the NYPD Operations Division issued a FINEST message to all members of the NYPD relating to the curfew order, instructing them that "[e]nforcement will be taken only after several warnings are issued and the violator is refusing to comply."

33.     The next day, June 2, 2020, Mayor de Blasio issued Emergency Executive Order No. 119. This order extended the "City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m., beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020."

34.     This emergency order also stated that "[f]ailure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provision in this Order shall be guilty of a class B misdemeanor" under New York City Administrative Code § 3-108.

35.     New York City Administrative Code § 3-108 contains a similar scienter requirement: "Any *knowing* violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor . . . ." (emphasis added).

36.     While policing the George Floyd protests, officers of the NYPD repeatedly engaged in excessive force and indiscriminate mass arrests of demonstrators.

37.     The NYPD arrested at least 2,047 people who were participating in protests between May 28 and June 5, 2020; at least 290 of these arrests occurred on June 2, 2020.[1]

38.     The NYPD's often unconstitutional policing of the George Floyd protests has been detailed in reports from the New York State Attorney General and the New York City

---

[1] These figures are based on arrests processed in the NYPD's Mass Arresting Processing Centers. *See* DOI Report at 26. Records kept by the NYPD's Joint Operations Center indicate a higher tally of arrests. *See id.* at 24.

Department of Investigation. *See* New York State Office of the Att'y Gen., *New York City Police Department's Response to Demonstrations Following the Death of George Floyd* (June 2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf ("AG Report"); New York City Dep't of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf ("DOI Report").

39.     It is also the subject of numerous civil suits filed in this district and the Southern District of New York, including putative class actions. *See, e.g.*, *Payne v. de Blasio*, 20-cv-8924 (S.D.N.Y.); *Wood v. City of New York*, 20-cv-10451 (S.D.N.Y.); *People v. City of New York*, 21-cv-322 (S.D.N.Y.); *Sow v. City of New York*, 21-cv-533 (S.D.N.Y.); *Gelbard v. City of New York*, 20-cv-3163 (E.D.N.Y.); *Zayer v. City of New York*, 20-cv-6070 (E.D.N.Y.).

40.     This complaint, however, focuses on what happened to Ahmed Sami on June 2, 2020, the aftermath of this incident, and how his injuries were directly and proximately caused by policymakers' deliberate indifference to the risk of protesters being injured by flex-cuffs.

### The Events of June 2, 2020

41.     On June 2, 2020, Sami, his girlfriend Ariel Trevett, and his friends Matthew Perry and Ray Slicher went to participate in a peaceful Black Lives Matter demonstration.

42.     They arrived at Union Square in Manhattan at about 3:00 p.m.

43.     After listening to some speeches at Union Square, Sami and his friends took part in a march through Manhattan, walking with the crowd.

44.     Eventually, Sami and his friends arrived near the southeast corner of Central Park.

45.     While they were standing outside Central Park, Sami and his friends decided to leave the protest and go home.

46.     It was shortly before 8:00 p.m.

47.     As Sami and his friends were trying to leave, their way was blocked by a group of police officers, who told them that the street they were trying to walk down was closed.

48.     The officers told Sami and his friends which way to go to get to the subway.

49.     This group of officers then walked along with Sami and his friends.

50.     Cellphone video taken by Trevett shows a group of uniformed officers walking and calmly chatting with Sami and his friends. It was still light out.

51.     While Sami and his friends were walking in the direction indicated by the officers and talking to them, another group of officers approached from behind Sami and his friends.

52.     This second group of officers, which included Officers John Doe # 1 through # 5, arrested Sami and his friends.

53.     These officers did not order them to disperse first, mention the curfew, or give them any warning.

54.     Officers John Doe # 1 to # 5 grabbed Sami from behind, forced him facedown to the ground, kneed or kicked him in the ribs, and tightly handcuffed him using plastic handcuffs.

55.     The officers continued kicking or kneeing Sami after he was handcuffed.

56.     Sami did not resist arrest.

57.     On the cellphone video taken by Trevett, Sami can be heard saying "Stop it! We were trying to leave. We were trying to leave. We have no way to leave. You're hurting me."

7

58.     After Sami was rear-cuffed, Officers John Doe # 1 to # 5 picked him up and placed him against a nearby wall.

59.     Sami's friends, Trevett, Slicher, and Perry, were all also handcuffed and placed against that wall or another nearby wall section.

60.     While Sami was sitting against the wall, Officer Jonathan Molina approached.

61.     Sami told Molina that he and his friends had not been doing anything illegal and had just been trying to leave.

62.     Molina told Sami to shut up.

63.     Molina and other officers placed Sami and his three friends in a police van.

64.     Sami asked Molina why he was being arrested.

65.     Molina responded that they were all getting a summons.

66.     In addition to the arrestees, Officer Molina, Officer FNU Ayala, and a third unidentified police officer, Officer John Doe # 6, who was driving, were present in the van.

67.     The officers drove Sami and the other arrestees to Brooklyn Central Booking.

68.     While he was sitting in the police van, Sami repeatedly complained to Molina that his handcuffs were tight and hurting him and that his hands were falling asleep.

69.     Sami asked Molina to take his flex-cuffs off or loosen them.

70.     Sami was directing these comments to Molina, but he spoke loudly enough for everyone in the van, including the other police officers, to hear him.

71.     Molina refused to do anything about it and told Sami to "shut up."

72.     Sami's girlfriend, Trevett, also asked the police officers to check on Sami's handcuffs, but they refused to do so.

8

73.     While he was in the van, Sami's hands went cold and then became numb.

74.     Once Sami and his friends arrived at Brooklyn Central Booking, police officers took the mask that Sami had been wearing to protect himself and others against COVID-19.

75.     Sami asked why the officers were not wearing masks and whether he could have his mask back, but the officers refused to give his mask back to him.

76.     Sami, still handcuffed, was placed in a holding cell with his friend Perry.

77.     Slicher and Trevett were placed in a different holding cell or holding cells.

78.     While Sami was in the cell with Perry, the police lodged other arrested protestors in their cell and it was impossible to maintain social distancing.

79.     The cell was filthy and had what appeared to be feces smeared on the walls.

80.     While Sami was in Central Booking, he complained to Molina and to a Black male officer in plainclothes, Officer John Doe # 7, that the flex-cuffs were hurting him.

81.     Molina and Officer Doe # 7 did not loosen or remove the flex-cuffs.

82.     After Sami had been in the holding cell for a substantial period of time, Molina came by and took a hook-like tool out of his pocket.

83.     Molina tried to cut off Sami's flex-cuffs, but they were so tight against Sami's wrists that Molina was unable to get the hook tool underneath the flex-cuffs.

84.      After Molina was unable to cut Sami's flex-cuffs off with this tool, officers tried to cut the flex-cuffs off with a box cutter, but they were still unable to remove them.

85.     Eventually, officers were able to cut the flex-cuffs off with a bolt cutter.

86.     After the officers had succeeded in cutting off the flex-cuffs, they placed Sami in a second, different holding cell. Sami was not handcuffed while in this second holding cell.

87.     After Sami had spent an hour or two in this second holding cell, Molina came by with a pink summons for a violation of "AC 3-108" and escorted him out from Central Booking.

88.      By the time that Sami left, it was 1:00 or 2:00 a.m. on June 3, 2020.

89.     The summons said that Sami was to report to court on September 29, 2020, but before that date, he received a letter in the mail saying that all charges had been dismissed.

**The Aftermath**

90.     The day after this incident, Sami went to an urgent care to seek treatment for the pain in his hands and arms, where he was referred to an orthopedist for further care.

91.     The orthopedist diagnosed Sami with a bilateral "wrist dorsal radial sensory nerve/extensor tenosynovitis," an "[i]njury of radial nerve at forearm level" on both arms, and "[w]rist dorsal radial sensory nerve mild neuropraxia."

92.     Sami had trouble performing his job after this incident because it was painful and difficult to use a computer.

93.     He had to wear splints that extended up his forearms full time for the rest of the month of June, and he slept with these wrist braces on from July until the end of November 2020.

94.     For months after this incident, Sami felt burning pain in his hands and wrists.

95.     Sami still sometimes suffers from loss of feeling in his hands and fingers.

96.     In addition to his day job, Sami had occasionally worked as a freelance photographer and taught yoga classes in the park prior to June 2, 2020.

97.     As a result of this incident, he was forced to temporarily stop working as a photographer and a yoga teacher, thereby diminishing his income.

98.     While he had previously practiced yoga every day, he stopped doing so because he was unable to perform poses that put weight on his hands and wrists such as handstands.

99.     He has suffered from anxiety, fear of going outside, and fear of the police since this incident, and he has had recurring nightmares of being kidnapped and thrown in a van.

100.    Although the June 2, 2020 march was not the first Black Lives Matter protest Sami attended, he has not gone to any Black Lives Matter demonstrations since his arrest.

101.    He has been too scared of the police and being arrested to go to another protest.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 claim for false arrest under the Fourth Amendment by Officers John Doe # 1 to # 5 and Officer Molina

102.    Plaintiff repeats and realleges paragraphs 1 through 101 as if set forth here.

103.    Officers John Doe # 1 to # 5 and Officer Molina intentionally arrested Sami and/or failed to intervene to prevent his arrest.

104.    Sami was aware of this confinement.

105.    Sami did not consent to this confinement.

106.    Officers were not privileged to make Sami's arrest inasmuch as they lacked a warrant and probable cause to believe that Sami had committed a crime.

107.    Officers John Doe # 1 to # 5 and Officer Molina are therefore liable to Sami, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for his attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 claim for First Amendment retaliation by all
### individual defendants

108.     Plaintiff repeats and realleges paragraphs 1 through 106 as if set forth here.

109.     By attending a Black Lives Matter demonstration, Sami was exercising his First

Amendment rights to freedom of speech and freedom of assembly.

110.     Motivated by Sami's First Amendment protected activity, Officers John Doe # 1

to # 7 and Officer Molina retaliated against Sami and/or failed to intervene to prevent retaliation.

111.     This retaliation proximately and directly caused injury to Sami.

112.     This retaliation was sufficient to chill a person of ordinary firmness from engaging

in First Amendment protected activities such as attending protests.

113.     This retaliation in fact deterred Sami from attending further demonstrations.

114.      The individual defendants are therefore liable to Sami, under 42 U.S.C. §§ 1983

and 1988, for all the reasonably foreseeable injuries that their unlawful conduct caused and for his

attorneys' fees, costs, and expenses.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 claim for unreasonable use of force under the
### Fourth Amendment by all individual defendants

115.     Plaintiff repeats and realleges paragraphs 1 through 101 as if set forth here.

116.     Officers John Doe # 1 to # 5 kneed or kicked Sami in the ribs and handcuffed him

too tightly even though he was not resisting arrest.

117.     Sami repeatedly complained to Officer Molina, Officer Ayala, and Officers John

Doe # 6 and # 7 that the flex-cuffs were unreasonably tight and causing him intense pain.

12

118.   Yet no officer took any action to loosen or remove Sami's flex-cuffs until a substantial period of time after he arrived at Brooklyn Central Booking.

119.   As a result of the flex-cuffs being too tight and staying on for too long, Sami suffered nerve damage that caused him great pain and took months to heal.

120.   He still sometimes experiences numbness in his hands.

121.   The individual police officer defendants are therefore liable to Sami, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that their unreasonable use of force and/or failure to intervene caused and for his attorneys' fees, costs, and expenses.

## FOURTH CAUSE OF ACTION

### *Monell*/42 U.S.C. § 1983 claim against the City of New York for the NYPD's failure to train, discipline, and supervise officers on the proper application and removal of plastic flex-cuffs

122.   Plaintiff repeats and realleges paragraphs 1 through 101 as if set forth here.

123.   It has long been the NYPD's policy, practice, or custom to handcuff individuals arrested at demonstrations or protests using plastic flex-cuffs instead of metal handcuffs.

124.   Prior to the George Floyd protests, policymakers at the NYPD had repeatedly been made aware by civilian complaints, litigation, and policy reports that arrestees were suffering injuries due to the use—and misuse—of flex-cuffs while policing mass demonstrations.

125.   After the 2004 protests against the Republican National Convention, for instance, the New York Civil Liberties Union received 50 complaints "about the misuse of plastic handcuffs" by the NYPD. NYCLU, *Rights and Wrongs at the RNC* 34 (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf. "Sixteen reports came from people who sustained injuries as a result of being in flexcuffs." *Id.* at

35; *see also id.* at 15 ("By all accounts, virtually every person arrested during the Convention was restrained using plastic handcuffs . . . ."); *id.* at 16 ("The NYLCU has received many complaints about improper use of flexcuffs by the NYPD at demonstrations in recent years, but the Convention generated the most serious complaints to date.").

126.    In *Burley v. City of New York*, 03-cv-2915 (S.D.N.Y.), a class action involving over 200 demonstrators arrested at a 2002 protest, the plaintiffs challenged, among other things, the NYPD's policy and practice of using plastic flex-cuffs as unreasonable because of the manner in which they were applied and the length of time the plaintiffs were handcuffed.

127.    In *Kunstler v. City of New York*, 04-cv-1145 (S.D.N.Y.), the plaintiffs raised *Monell* claims pertaining to the NYPD's use of overly tight plastic handcuffs.

128.    In *MacNamara v. City of New York*, a class action involving mass arrests of protesters of the Republican National Convention, the district court certified a "Conditions of Confinement Class" comprising all "RNC arrestees who were detained at Pier 57 and handcuffed with plastic flex cuffs." 275 F.R.D. 125, 153–54 (S.D.N.Y. 2011) (Sullivan, then D.J.).

129.    In its report on the policing of anti-war protests in 2003, the New York Civil Liberties Union recommended that the NYPD "assess its use of plastic handcuffs ('flexcuffs') as they are not designed to be used for extended periods of time and can cause serious discomfort and actual injury if used in this manner." NYCLU, *Arresting Protest* 33 (April 2003), *available at* https://www.aclu.org/sites/default/files/FilesPDFs/nyclu_arresting_protest1.pdf.

130.    In its report on the policing of protests against the 2004 Republican National Convention, the New York Civil Liberties Union similarly recommended that "the NYPD must assure that plastic handcuffs are used appropriately," noting that "[i]n light of the large number

of complaints the NYCLU received about the use of plastic handcuffs . . . , it is apparent that the NYPD's training and supervision in this area is inadequate." *Rights and Wrongs at the RNC* 56.

131.    Upon information and belief, despite being aware that its training and supervision has proved inadequate to prevent injury to protestors, the NYPD has not implemented any additional training or supervision as to the proper use of flex-cuffs, including how to measure the appropriate tension on flex-cuffs, how to assess the need to remove flex-cuffs, how long flex-cuffs can safely be worn, the safest type of flex-cuffs to use, and how to remove flex-cuffs.

132.    Upon information and belief, the NYPD has routinely failed to discipline officers for injuring protestors by excessively tightening flex-cuffs or failing to timely remove them.

133.    Despite repeated reports that protestors have been injured by the use of improperly applied flex-cuffs, the NYPD does not typically use flex-cuff pads, which can help prevent injuries from flex-cuffs being applied too tightly or too long, when arresting protesters.

134.    Indeed, Sami is far from the only person arrested during the George Floyd protests to have suffered injury from flex-cuffs that were too tight and/or applied for too long. "Those arrested frequently complained that their flex-cuffs were too tight and caused pain or damage—with some alleging long-term nerve damage—to their wrists or hands." DOI Report at 42*; see also, e.g.*, Am. Compl. ¶ 469, *Sow v. City of New York*, 21-cv-533, ECF No. 49 (S.D.N.Y. Mar. 6, 2021) ("In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.") (putative class action); AG Report at 29 ("Several witnesses testified that officers zip tied their wrists so tightly that they lost feeling in their arms and hands and that officers refused their requests for assistance."); Peter Senzamici, *Plastic Handcuff Use by NYPD During Anti-Brutality Protests Strikes a Nerve*, The City, July 22,

2020, https://www.thecity.nyc/2020/7/22/21335083/plastic-handcuff-use-by-nypd-during-anti-

brutality-protests-strikes-a-nerve (reporting complaints about the use of flex-cuffs).

135.     The Police Commissioner and/or other municipal policymakers knew to a moral

certainty that police officers would use plastic flex-cuffs when arresting demonstrators at mass

protests, because it was the NYPD's policy, practice, or custom to do so.

136.     The Police Commissioner and/or other municipal policymakers knew or should

have known that how tightly to fasten flex-cuffs, when flex-cuffs need to be removed, and how

long flex-cuffs can safely be worn, present the kind of difficult or non-obvious choices that

instruction, training, supervision, and/or discipline would make less difficult.

137.     The Police Commissioner and/or other municipal policymakers knew or should

have known that there was a history of police officers causing injuries to individuals arrested at

demonstrations by making flex-cuffs too tight or failing to timely remove them.

138.     The Police Commissioner and/or other municipal policymakers knew or should

have known that the failure of police officers to properly apply and timely remove flex-cuffs

would frequently cause the deprivation of the constitutional rights of demonstrators.

139.     Under the principles of municipal liability for federal civil rights violations, the

Police Commissioner (or his authorized delegates), has final responsibility for training,

instructing, supervising, and disciplining police personnel with respect to policing protests.

140.     The Police Commissioner, personally and/or through his authorized delegates, at

all relevant times had final authority, and constitutes a City policymaker for whom the City is

liable, with respect to compliance by NYPD employees with their constitutional obligations.

141.     During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the constitutional rights of individuals arrested at demonstrations and secured with plastic flex-cuffs.

142.     The injuries in this case were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are handcuffed using flex-cuffs.

143.     The City of New York is therefore liable to Sami, under 42 U.S.C. §§ 1983 and 1988, for all the reasonably foreseeable injuries that its unlawful conduct caused and for his attorneys' fees, costs, and expenses.

### FIFTH CAUSE OF ACTION

**Common-law claim for false arrest and false imprisonment
against Officers John Doe # 1 to # 5, Officer Molina, and the
City of New York**

144.     Plaintiff repeats and realleges paragraphs 1 through 101 as if set forth here.

145.     Sami was unlawfully, unjustifiably, and intentionally arrested, transported, detained, deprived of his liberty, and imprisoned.

146.     Sami was aware of this confinement.

147.     Sami did not consent to this confinement.

148.     There was no warrant or probable cause for Sami's arrest, and the confinement was not otherwise privileged.

149.    Moreover, there was no probable cause to believe that Sami committed an offense for which New York Criminal Procedure Law § 150.20 permitted a custodial arrest.

150.    Following the January 1, 2020 revision of the New York Criminal Procedure Law, the police were required to issue Sami a criminal court summons instead of taking him into custody. *See* N.Y. Crim. Proc. Law § 150.20(1)(a) ("Whenever a police officer is authorized pursuant to section 140.10 of this title to arrest a person without a warrant . . . he *shall* . . . instead issue to and serve upon such person an appearance ticket." (emphasis added)).

151.    None of the statutory exceptions under CPL § 150.20(1)(a) that relieve a police officer from the requirement of issuing an appearance ticket in lieu of custodial arrest applied.

152.    At all relevant times, the individual defendants were employees of the NYPD, acting in furtherance of the business of their employer and within the scope of their employment.

153.    The City is liable for their actions under the doctrine of *respondeat superior*.

154.    Officers John Doe # 1 to # 5, Officer Molina, and the City are therefore liable to Sami for all the reasonably foreseeable injuries that their unlawful conduct caused and for his attorneys' fees, costs, and expenses.

## SIXTH CAUSE OF ACTION

### Common-law claim for excessive force and assault and battery against all defendants

155.    Plaintiff repeats and realleges paragraphs 1 through 106 and 116 through 120 as if set forth here.

156.    During the course of unlawfully arresting Sami, the individual defendants used an unreasonable amount of force and caused Sami unnecessary physical injuries.

157.     Moreover, because Sami was arrested without probable cause, any and all force used to arrest him, even mere touching, constituted assault and battery at common law.

158.     At all relevant times, the individual defendants were employees of the NYPD, acting in furtherance of the business of their employer and within the scope of their employment.

159.     The City is liable for their actions under the doctrine of *respondeat superior*.

160.     The defendants are therefore liable to Sami for all the reasonably foreseeable injuries that their unlawful conduct caused and for his attorneys' fees, costs, and expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court grant the following relief:

a.   Compensatory damages in an amount to be determined at trial;

b.   Punitive damages in an amount to be determined at trial;

c.   Reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court;

d.   Pre- and post-judgment interest as allowed by law; and

e.   Any additional relief that this Court may deem just and proper.

Law Offices of Joel B. Rudin, P.C.

/s/ Matthew A. Wasserman
By:   Matthew A. Wasserman
Law Offices of Joel B. Rudin, P.C.
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
mwasserman@rudinlaw.com

*Attorney for the Plaintiff*

Dated: New York, New York
         May 18, 2021

19